## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**DAVID WARD,**

    Plaintiff,

      v.

**FRANK NOONAN, *et. al*.,**

    Defendants.

CIVIL ACTION NO. 3:11-CV-945

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Defendants Canton Borough and Douglas Seeley's ("Canton Defendants") Motion for Summary Judgment (Doc. 80.); Defendants Towanda Borough, John Storzyk, and James L. Hart's ("Towanda Defendants") Motion for Summary Judgment (Doc. 82.); and Defendants Frank Noonan, Jeffrey Miller ("Colonel Miller"), John Yencha ("Corporal Yencha"), Robert Hutchinson, Jeffrey Creeden, John Kern, Brian Fedor, Benjamin Biggus, Thomas Blair ("Trooper Blair") and James Dughi's ("Trooper Dughi") (collectively "Commonwealth Defendants") Motion for Summary Judgment  (Doc. 91.). In his Second Amended Complaint (Doc. 37.), Plaintiff David Ward[1] ("Mr. Ward") brings this suit pursuant to 42 U.S.C. § 1983 claiming violations of his constitutional rights arising out of an incident that occurred on May 24, 2009.

Because Mr. Ward fails to present sufficient evidence to support his claims against the Canton Defendants, their motion for summary judgment will be granted. Based on  Mr. Ward's agreement that he cannot advance a *Monell* claim or a request for punitive damages

---

[1]

      Plaintiff's original Complaint (Doc. 1.) and Amended Complaint (Doc. 3.) named Plaintiff's wife, Jocelyn Ward, as an additional Plaintiff. However, Mrs. Ward has not been named as a Plaintiff in Plaintiff's Second Amended Complaint (Doc. 37.).

against the Towanda Defendants, their motion for summary judgment will be granted on those claims. Because Mr. Ward has failed to allege any involvement of Commonwealth Defendants Noonan, Hutchinson, Creeden, Kern, Fedor and Biggus, their motion for summary judgment will be granted. Due to a failure of Mr. Ward to present sufficient evidence on claims against Colonel Miller and Corporal Yencha for failure to train, supervise, investigate or discipline, their motion for summary judgment will be granted. The motion for summary judgment filed by Troopers Dughi and Blair on Mr. Ward's malicious prosecution, due process and failure to train, supervise, or discipline claims will be granted because Mr. Ward has failed to advance such claims. Trooper Blair's motion for summary judgment on Mr. Ward's unlawful arrest claim will be granted as he is entitled to qualified immunity. Because there are disputed issues of fact with regard to whether Mr. Ward was resisting arrest, Trooper Blair and Officers Strozyk and Hart's motions for summary judgment on Mr. Ward's claims for excessive force will be denied.

## I. Background

### A.    Factual Background[2]

On May 24, 2009, a DUI checkpoint was set up, operated and maintained by the Canton Borough Police Department, the Towanda Borough Police Department, and the Pennsylvania State Police ("PSP") on State Route Fourteen in Canton Borough, Pennsylvania. (Doc. 93, *Commw. Defs.' Statement of Material and Undisputed Facts*, "*Commw. Defs. SMF*," ¶ 1.; Doc. 109, *Pl.'s Counter-statement to Commw. Defs' Undisputed Material Facts*, "*Pl.'s CSMF-Commw. Defs*" ¶ 1.)[3] Troopers James Dughi ("Trooper Dughi"),

---

[2]

The Canton and Towanda Defendants incorporate by reference the Statement of Material  Facts filed by the Commonwealth Defendants (Doc. 93.). (*Canton Defs. SMF,* ¶ 1; *Towanda Defs. SMF*, ¶ 1.)

[3]

Despite Mr. Ward's denial of Commonwealth Defendants' statement of fact, the date of the DUI checkpoint and the entities represented at the checkpoint are not in dispute. Throughout his counter-statements (Doc. 106; 107; 109.), Mr. Ward's responses to facts presented by Defendants fail to comply with Local Rule 56.1. Mr. Ward's counter-

Thomas Blair ("Trooper Blair") and Jeffrey Creeden were assigned to work at the checkpoint. (*Commw. Defs.SMF*, ¶¶ 2-4; *Pl.'s CSMF-Commw. Defs*, ¶¶ 2-4.) Troopers Dughi and Blair were partnered together on the line. (*Commw. Defs. SMF*, ¶ 7; *Pl.'s CSMF-Commw. Defs.*, ¶ 7.) Corporal John M. Yencha ("Corporal Yencha") was on roving patrol.

---

statements, at many points, deny the averment and either present additional, irrelevant facts or make argument as to the merits of the case. Local Rule 56.1 of the United States District Court for the Middle District of Pennsylvania provides:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, will be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried, The papers opposing a motion for summary judgment will include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion will include material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. Local R. 56.1. "The purpose of this rule is obvious: it enables the court to identify contested facts expeditiously and prevents factual disputes from becoming obscured by a lengthy record." *Pinegar v. Shinseki,* 2009 WL 1324125 (M.D.Pa. May 12, 2009). The opposing statements have been reviewed, and where Mr. Ward does properly challenge the facts put forth by Defendants, such disagreement is noted. Where Plaintiff fails to properly contest the defendants' facts, I set forth what has been admitted by Plaintiff by virtue of failing to comply with Local Rule 56.1.

(*Commw. Defs. SMF*, ¶ 5; *Pl.'s CSMF-Commw. Defs.*, ¶ 5.) Canton Borough Chief of Police Douglas Seeley ("Chief Seeley") was at the location of the checkpoint but was inside the hall next to the checkpoint. (Doc. 80, *Canton Defs.' Statement of Undisputed Material Facts*, "*Canton Defs. SMF*," ¶¶ 3-4.; Doc. 107, *Pl.'s Counter-statement to Canton Defs.' Undisputed Material Facts*, "*Pl.'s CSMF-Canton Defs.*," ¶¶ 3-4.)  Towanda Borough police officers, James Strozyk ("Officer Strozyk") and James Hart ("Officer Hart") were also working the line in proximity to each other. (Doc. 84, *Towanda Defs. Statement of Undisputed Material Facts*, "*Towanda Defs. SMF*," ¶ 38.; Doc. 105, *Pl.'s Counter-statement to Towanda Defs' Undisputed Material Facts*, "*Pl.'s CSMF-Towanda Defs'*" ¶ 38.)

Canton Borough has an approximate population of 1900 residents and ranked third in Bradford County, Pennsylvania in alcohol related crashes from 1998 to 2001 and again in 2003. (*Commw. Defs. SMF*, ¶ 45; *Pl.'s CSMF-Commw. Defs.*, ¶ 45.) Between 1998 and 2003, the Canton Borough Police Department made fifty-one DUI arrests. (*Commw. Defs. SMF*, ¶ 46; *Pl.'s CSMF-Commw. Defs.*, ¶ 46.) The number remained relatively constant between the years 2004 to 2006, with twenty-five total arrests for DUI. (*Id.*) The Bradford County DUI Task force began conducting sobriety checkpoints on Route Fourteen in Canton Borough to prevent drunk driving. (*Commw. Defs. SMF*, ¶ 56; *Pl.'s CSMF-Commw. Defs.*, ¶ 56.)[4]

In May 2009, the DUI checkpoint was sponsored by Canton Borough, which is a municipal entity, organized and existing under the laws of the Commonwealth of Pennsylvania and located in Canton, Bradford County, Pennsylvania. (*Canton Defs. SMF*, ¶¶ 2, 7; *Pl.'s CSMF-Canton Defs.*, ¶¶ 2, 7.) Officers were instructed to observe drivers for signs of intoxication and were provided with a script to guide their interactions with motorists. (*Commw. Defs. SMF*, ¶ 50; *Pl.'s CSMF-Commw. Defs.*, ¶ 50.) The PSP regulations permitted officers to ask the driver to produce a license, registration and proof

---

[4]

Mr. Ward denies Commonwealth Defendants' stated reasons for why the checkpoint was set up.

of financial responsibility, purportedly serving the additional purpose of checking drivers for signs of intoxication. (*Commw. Defs. SMF*, ¶¶ 47, 52-53; *Pl.'s CSMF-Commw. Defs.*, ¶¶ 47, 52-53; Doc. 94-10, 110-23.) All officers at the checkpoint were in uniform. (*Commw. Defs. SMF*, ¶ 54; *Pl.'s CSMF-Commw. Defs*, ¶ 54.)  Every vehicle was stopped at the checkpoint and the stops were brief. (*Commw. Defs. SMF*, ¶¶ 48-49; *Pl.'s CSMF-Commw. Defs.*, ¶¶ 48-49.)[5]

Just after midnight on May 24, 2009, a 2005 Chevrolet Equinox, driven by Jocelyn Ward ("Mrs. Ward"), was stopped by Troopers Dughi and Blair while going through the checkpoint. (*Commw. Defs. SMF*, ¶ 8; *Pl.'s CSMF-Commw. Defs.*, ¶ 5.)  The vehicle was occupied by Mrs. Ward; Mr. Ward; and three backseat passengers: Chloe Ward, Eric Tenny, and Ryan Weider. (*Commw. Defs. SMF*, ¶ 9; *Pl.'s CSMF-Commw. Defs.*, ¶ 9.) When the window was rolled down, Trooper Dughi could detect the smell of alcohol emanating from inside the vehicle. (*Commw. Defs. SMF*, ¶ 10; *Pl.'s CSMF-Commw. Defs.*, ¶ 10.) Trooper Dughi introduced himself to Mrs. Ward, told her what he was doing there and asked for her driver's license, insurance card, and vehicle registration. (*Commw. Defs. SMF*, ¶ 11; *Pl.'s CSMF-Commw. Defs.*, ¶ 11.) Mrs. Ward told Trooper Dughi she did not have a driver's license with her. (*Commw. Defs. SMF*, ¶ 13; *Pl.'s CSMF-Commw. Defs.*, ¶ 13.) Mr. Ward told Trooper Dughi, "I've been f--king drinking." (*Commw. Defs. SMF*, ¶ 14; *Pl.'s CSMF-Commw. Defs.*, ¶ 14.) Mr. Ward had consumed eight to ten drinks that evening over an approximate four hour time period. (*Commw. Defs. SMF*, ¶ 15; *Pl.'s CSMF-Commw. Defs.*, ¶ 15.) Trooper Blair was positioned at the rear of the vehicle and described Mr. Ward's language as very loud and yelling toward Trooper Dughi. (*Commw. Defs. SMF*, ¶

---

[5]

Mr. Ward denies that the stops were brief, indicating that testimony to which Commonwealth Defendants cite is from a person without direct knowledge. (*Pl.'s CSMF-Commw. Defs.*, ¶ 49.) However, Mr. Ward has not cited to evidence of record that counters that the stops were anything but brief.

16; *Pl.'s CSMF-Comm. Defs.*, ¶ 16.)[6] Trooper Dughi directed Mrs. Ward to move the vehicle off the roadway into a pull-off area. (*Commw. Defs.'SMF*, ¶ 17; *Pl.'s CSMF-Comm. Defs.*, ¶ 17.) Trooper Blair continued to hear Mr. Ward yell as the vehicle was pulling off the roadway. (*Commw. Defs. SMF*, ¶ 18; *Pl.'s CSMF-Comm. Defs.*, ¶ 18.) Trooper Dughi followed the vehicle to the pull-off area on foot and Trooper Blair remained in his original position. (*Commw. Defs. SMF*, ¶ 19; *Pl.'s CSMF-Comm. Defs.*, ¶ 19.) Trooper Dughi then informed Mrs. Ward that he would run her information through NCIC to determine if she had a valid driver's license and if so, he would give her a verbal warning and she would be free to go. (*Commw. Defs. SMF*, ¶ 20; *Pl.'s CSMF-Comm. Defs.*, ¶ 20.) Trooper Dughi testified that, from his initial contact,  Mr. Ward continued to say that he had been drinking, he was a passenger, he kept on using vulgar language and would not stop, despite orders. (*Commw. Defs. SMF*, ¶ 21; *Pl.'s CSMF-Comm. Defs.*, ¶ 21.)[7] Trooper Dughi described Mr. Ward's interruptions and vulgarities as being uttered in a loud tone of voice, and described his overall demeanor as aggressive. (*Commw. Defs. SMF*, ¶ 22; *Pl.'s CSMF-Comm. Defs.*, ¶ 22.)[8] Trooper Dughi additionally described Mr. Ward's demeanor as becoming more agitated as his hand movements became more violent. (*Commw. Defs.*

---

[6]

    Mr. Ward denies Commonwealth Defendants' statement of fact stating "it is denied that Mr. Ward was yelling in a loud voice when he initially stated that he was drinking and Mrs. Ward was the designated driver." (*Pl.'s CSMF-Comm. Defs.*, ¶ 16.) Mr. Ward additionally cites to the deposition of Ryan Weider who stated that "I don't believe he was loud."

[7]

    Mr. Ward denies Commonwealth Defendants' statement of fact and states that "[t]o the contrary the testimony of Ward and several witnesses contradicts Dughi," (*Pl.'s CSMF-Comm. Defs.*, ¶ 21.) however, the portions of the record cited, *i.e.,* deposition testimony of Mr. Ward, Mrs. Ward. Mr. Wieder, and Mr. Tenny, do not contradict the statement, but rather cites to record evidence that evidences different perspectives.

[8]

    Mr. Ward denies Commonwealth Defendants' statement of fact again by citing to other record evidence of occupants in the vehicle. (*Pl.'s CSMF-Comm. Defs.*, ¶ ¶ 21-22.)

*SMF*, ¶ 23; *Pl.'s CSMF-Comm. Defs.*, ¶ 23.)[9] Trooper Dughi was distracted from the other occupants of the vehicle by Mr. Ward , thereby creating officer safety concerns. (*Comm. Defs. SMF*, ¶ 24; *Pl.'s CSMF-Comm. Defs.*, ¶ 24.)[10] Mr. Ward refused to comply with commands from Trooper Dughi to cease both his aggressive behavior and vulgar language. (*Comm. Defs. SMF*, ¶ 25; *Pl.'s CSMF-Comm. Defs.*, ¶ 25.)[11] Mr. Ward contests Trooper Dughi's characterization of Mr. Ward's demeanor while in the vehicle. *(Pl.'s CSMF-Comm. Defs.*, ¶ 25.)

Trooper Dughi came to the passenger side of the vehicle, opened the door and ordered Mr. Ward out, to which Mr. Ward responded, "Why? What did I do?" (*Comm. Defs. SMF*, ¶ 26; *Pl.'s CSMF-Comm. Defs.*, ¶ 26.) Trooper Blair approached the vehicle from his location, about one hundred to two hundred feet away. (*Comm. Defs. SMF*, ¶ 27; *Pl.'s CSMF-Comm. Defs.*, ¶ 27.)[12] Trooper Blair heard Trooper Dughi tell Mr. Ward that he was under arrest and to get out of the car. (*Comm. Defs. SMF*, ¶ 27; Doc. 94-3, Ex. C

---

[9]

Mr. Ward denies Commonwealth Defendants' statement of fact again by citing to other record evidence of occupants in the vehicle. (*Pl.'s CSMF-Comm. Def.*, ¶¶ 21, 23.)

[10]

Despite denial, Mr. Ward fail to effectively deny the statement.

[11]

Mr. Ward states: "It is specifically denied that Ward refused to comply with commands from Trooper Dughi to cease both his aggressive behavior and vulgar language. The only command given by Dughi to Ward prior to Dughi running him [sic] around the car and yanking the passenger door open and yelling at Ward to get out of the [c]ar was to "shut his mouth," to which Ward responded "Okay I'll shut my mouth" and he folded his arms." Immediately after verbally complying, and, in fact, complying, Dughi immediately proceeded to force Ward out of the car." (*Pl.'s CSMF-Comm. Defs'*, ¶ 25; Ward Deposition Testimony, Exhibit A, p. 31.)"

[12]

Despite denial of the averment, Mr. Ward admits Blair was approximately one hundred to two hundred feet away. (*Pl.'s CSMF-Comm. Defs.*, ¶ 27.)

7

,*Blair Deposition*, 22: 19-23.)[13]  Officer Hart went over to the pull-off area before Officer Strozyk. (*Towanda Defs. SMF*, ¶ 40; *Pl.'s CSMF-Towanda Defs.*, ¶ 40.) Officer Hart approached the rear of the vehicle and saw Trooper Dughi on the passenger side. (*Towanda Defs. SMF*, ¶ 60; *Pl.'s CSMF-Towanda Defs.*, ¶ 60.)  Mr. Ward denies he was ever told he was under arrest nor told more than once to get out of the vehicle, however, Officer Hart testified that he heard Trooper Dughi tell Mr. Ward he was under arrest and repeatedly order Mr. Ward to get out of the vehicle. (*Towanda Defs. SMF*, ¶¶ 60-61; *Pl.'s CSMF-Towanda Defs.*, ¶¶ 60-61.) Trooper Dughi tried to extract Mr. Ward from the vehicle, however, Mr. Ward testified that, while Trooper Dughi was grabbing his arm, he unbuckled his seat belt and got of out the vehicle. (*Commw. Defs. SMF*, ¶ 28; *Pl.'s CSMF-Commw. Defs.*, ¶ 28; Doc. 105-4, Ex. B, *Ward Trial Testimony,* 132-133.) Officer Hart testified that he heard Trooper Dughi announce that he would Taser Mr. Ward, but Mr. Ward contests this. (*Towanda Defs. SMF*, ¶ 63; *Pl.'s CSMF-Towanda Defs.*, ¶ 63.)

Mr. Ward was drive stunned[14] with a Taser for five seconds, then subject to a Taser probe deployment for seven seconds and then to an additional five seconds of a Taser probe deployment. (*Commw. Defs. SMF*, ¶ 28; *Pl.'s CSMF-Commw. Defs.*, ¶ 28.) Although it is disputed if Officer Strozyk arrived before or after Mr. Ward was drive stunned, Mr. Ward was hanging on the door of the vehicle and Officer Strozyk came to the area and Officer Strozyk told him, "Dave, just go down." (*Towanda Defs. SMF*, ¶¶ 4-5; *Pl.'s CSMF-Towanda Defs.*, ¶¶ 4-5.) At some point, Mr. Ward said to Officer Strozyk, "Jack . . . they are Tasering me." (*Towanda Defs. SMF*, ¶ 48; *Pl.'s CSMF-Towanda Defs.*, ¶ 48.) Mr. Ward continued to

---

[13]

Mr. Ward denies Commonwealth Defendants' statement. However, the response Mr. Ward provided does not point to record support of his position that he was not told he was under arrest. *(Pl.'s CSMF-Commw. Defs.*, ¶ 27.)

[14]

Drive stunning is described by Officer Strozyk as a direct contact stun with the Taser, where the cartridge is removed and prongs are not released. (Doc. 90,*Towanda Defs. Compilation,* Tab A, *Strozyk Deposition,* 71.)

hang on the door after the drive stun. (*Towanda Defs. SMF*, ¶ 66.) Trooper Dughi deployed the Taser on Mr. Ward's back and then applied a prong to his lower extremity. (*Towanda Defs. SMF*, ¶¶ 66-67; *Pl.'s CSMF-Towanda Defs.*, ¶¶ 66-67.) Officer Strozyk heard a pop, saw Mr. Ward become rigid, left his position in the front of the vehicle and walked around to the open passenger door. (*Towanda Defs. SMF*, ¶¶ 41, 51; *Pl.'s CSMF-Towanda Defs.*, ¶¶ 43, 51.) Officer Strozyk was on Mr. Ward's left shoulder and helped him to the ground and at some point told Mr. Ward: "Dave get clear down." (*Towanda Defs. SMF*, ¶¶ 52, 6; *Pl.'s CSMF-Towanda Defs.,* ¶¶ 52, 6.) Other officers helped bring Mr. Ward to the ground. (*Towanda Defs. SMF*, ¶ 69; *Pl.'s CSMF-Towanda Defs.,* ¶ 69.) The Taser prongs were still in Mr. Ward's back and he was subject to a Taser deployment while face down on the ground. (*Towanda Defs. SMF*, ¶ 70; *Pl.'s CSMF-Towanda Defs.*, ¶ 70.) Officer Strozyk told Mr. Ward to put his hands behind his back, cuffed Mr. Ward's one hand and passed the cuffs to Officer Hart to cuff the other hand. (*Commw. Defs. SMF*, ¶ 28; *Towanda Defs., SMF*, ¶ 53; *Pl.'s CSMF-Towanda Defs.*, ¶ 53.) Once Mr. Ward was in handcuffs, Officer Strozyk told Trooper Dughi "we got him" and there were no further Taser deployments. (*Towanda Defs. SMF*, ¶ 54; *Pl.'s CSMF-Towanda Defs.*, ¶ 54.) Mr. Ward asked Officer Strozyk what happened and Officer Strozyk told him he was unaware because he "came at the end of this." (*Towanda Defs. SMF*, ¶ 54; *Pl.'s CSMF-Towanda Defs.*, ¶ 54.) According to Trooper Blair and Officer Hart, throughout the incident, Mr. Ward refused to comply with commands to put his hands behind his back, however, Mr. Ward contests their assertions. (*Commw. Defs. SMF*, ¶ 29; *Pl.'s CSMF-Commw. Defs.*, ¶ 29.) Mr. Ward contends he was unable to comply because he was being Tasered for seventeen out of the twenty-two seconds that he was being arrested. (*Pl.'s CSMF-Commw. Defs.*, ¶ 29.)

Trooper Dughi believed Mr. Ward had committed the offense of disorderly conduct and believed he had probable cause to arrest Mr. Ward. (*Commw. Defs. SMF*, ¶ 30.) Mr. Ward was arrested at the checkpoint for disorderly conduct, additionally charged with resisting arrest, transported to the state police barracks, arraigned by phone and released to his wife. (*Commw. Defs. SMF*, ¶¶ 31-33; *Pl.'s CSMF-Commw. Defs.*, ¶¶ 31-33.) After a

preliminary hearing, charges of Disorderly Conduct and Resisting Arrest were bound over to court. (*Comm. Defs. SMF*, ¶ 34; *Pl.'s CSMF-Comm. Defs.*,  ¶ 34.)

Corporal Yencha was the supervisor of the PSP troopers working at the DUI checkpoint on May 24, 2009. *(Pl's CSMF-Comm. Defs.*, ¶ 59.) As such, Corporal Yencha, upon his return to the checkpoint and upon learning of the incident with Mr. Ward, filed an "Early Intervention Use of Force Tracking Worksheet." (*Comm. Defs. SMF*, ¶¶ 60-61; *Pl' s CSMF-Comm. Defs*., ¶¶ 60-61.) Corporal Yencha was not Trooper Dughi's regularly assigned supervisor and did not have the responsibility for determining or issuing discipline. (*Comm. Defs. SMF*, ¶¶ 59-60; *Pl' s CSMF-Comm. Defs.*, ¶¶ 59-60.)

As a result of the May 24, 2009 incident, Mr. Ward filed suit and raises claims regarding probable cause for his arrest, the manner in which he was removed from the vehicle when arrested, the use of a Taser during his arrest, and the manner in which he was restrained during his arrest. (*Comm. Defs. SMF*, ¶ 34; *Pl.'s CSMF-Comm. Defs.*, ¶ 34; *Second Am. Compl.)* Mr. Ward alleges he suffered physical injury as a result of the use of force, including the use of a Taser, during his arrest. (*Comm. Defs. SMF*, ¶ 34; *Pl.'s CSMF-Comm. Defs.*, ¶ 36; *Second Am. Compl.*, ¶ 66.)

## B.    Procedural Background

Relevant to the current motions, Mr. Ward filed a Second Amended Complaint (Doc. 37.) on December 28, 2011. On December 8, 2014, Canton Defendants filed a motion for summary judgment (Doc. 80.), a statement of facts (Doc. 83.), and a supporting brief (Doc. 85.). On December 8, 2014, Towanda Defendants also filed a motion for summary judgment (Doc. 82.), a statement of facts (Doc. 84.) and a supporting brief (Doc. 86.). On December 8, 2014, Commonwealth Defendants filed a motion for summary judgment (Doc. 91.), a statement of facts (Doc. 93.), and a brief in support (Doc. 96.). On January 28, 2015, Mr. Ward filed an answer to the Canton Defendants' statement of facts (Doc. 107.) and a brief in opposition to their motion (Doc. 108.), an answer to the Towanda Defendants' statement of facts (Doc. 105.), a brief in opposition to their motion (Doc. 106.) and an answer to the Commonwealth Defendants' statement of facts (Doc. 109.). On February 5, 2015, Mr. Ward filed a brief in opposition to the Commonwealth Defendants' motion. (Doc. 112.) On March 16, 2015, Commonwealth Defendants filed a reply brief. (Doc. 118.)  The

motions for summary judgment are now ripe for disposition.

## II.   Discussion

Defendants seek summary judgment on most of Mr. Ward's claims. More specifically, Commonwealth Defendants challenge claims contained in Count I of the Second Amended Complaint. Commonwealth Defendants have not filed for summary judgment on Mr. Ward's claims of unlawful arrest and excessive force against Trooper Dughi. The Towanda Defendants seek summary judgment on Count II of the Second Amended Complaint but failed to seek summary judgment on Mr. Ward's claims for unlawful arrest against Officer Strozyk and Hart. The Canton Defendants seek summary judgment on Count III of the Second Amended Complaint. The motions are addressed more fully below.

### A.   Legal Standard

#### 1.   Summary Judgment

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess*

*Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

### 2.    Section 1983

Mr. Ward has alleged violations of his constitutional rights and filed suit under 42 U.S.C. § 1983. Section 1983 states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or any other person . . . to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, will be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). "Action under color of state law 'requires that one liable under § 1983 have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (quoting *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998)).

### B.    Mr. Ward's Claims

The Second Amended Complaint states that the Defendants' actions violated Mr. Ward's due process rights in Counts I, II, and III. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of the law." U.S. Const. amend. XIV. Due process under the Fourteenth Amendment "has both substantive and procedural components." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). Despite allegations in the Second Amended Complaint, Mr. Ward states his excessive force claim is being brought under the Fourth Amendment not the Fourteenth. (Doc. 112, 22.) Mr. Ward has failed to articulate any allegation regarding the violation of his due process rights other than to simply state they were violated. Because there is no evidence of record regarding a due process violation, either procedural or substantive, the Defendants are entitled to summary judgment on any potential claim under the Fourteenth Amendment.

### 1.    COUNT I–Commonwealth Defendants[15]

At the outset, prior to engaging in an analysis of Mr. Ward's claims under the applicable summary judgment law, it is prudent to address the claims that do not require analysis. Count I of the Second Amended Complaint names several Commonwealth Defendants. In Mr. Ward's brief in opposition to the motion for summary judgment, he states the following: "[b]ased upon the discovery in this case, it is admitted that the Defendants Noonan, Hutchinson, Creeden, Kern, Fedor, and Biggus had no personal involvement in the attack on Mr. Ward." (Doc. 112, 10.) Because "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" for liability to attach, *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988), it follows that the above Defendants cannot be liable to Mr. Ward. Therefore,  summary judgment will be granted on behalf of Commonwealth Defendants Noonan, Hutchinson, Creeden, Kern, Fedor and Biggus.

The Commonwealth Defendants have moved for summary judgment on all of Mr. Ward's claims against Colonel Miller and Corporal Yencha. They have also moved for summary judgment on Mr. Ward's claims of malicious prosecution; due process; and failure to supervise, train or discipline against Troopers Dughi and Blair. They have moved for summary judgment on all other claims against Trooper Blair. The Commonwealth Defendants have not moved for summary judgment on excessive force or unlawful arrest against Trooper Dughi. Therefore, those claim remains and all other claims are addressed below.

### a.    *Failure to Train/Supervise*

Mr. Ward names Defendants Miller and Yencha as having been "deliberately indifferent to the following patterns, practices, and customs and the need for more or different training, supervision, investigation or discipline . . . " (*Second Am. Compl.,* ¶ 81.) To establish individual liability in a § 1983 case, a plaintiff must show that the defendant had "personal involvement in the alleged wrongs." *Rode,* 845 F.2d at 1207.  Where a supervisor did not directly participate in violating a plaintiff's rights, he may still be liable under § 1983

---

[15]

Mr. Ward's claim against the Commonwealth Defendants regarding the DUI checkpoint is addressed in Section B(III) below.

where he "directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

Where "the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to "deliberate indifference" to the rights of persons with whom those employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *City of Canton*, 489 U.S. at 388, 109 S. Ct. 1197)). Failure to train or supervise amounts to deliberate indifference when: "(1) municipal policymakers know that employees will confront a particular situation;  (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter,* 181 F.3d at 357. For a failure to train claim to "survive summary judgment . . ., the [plaintiff] must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *City of Canton*, 489 U.S. at 390).

 A supervisor may also be liable under § 1983 "if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct." *Brown*, 269 F.3d at 216.  A supervisor cannot be held liable, however, on a theory of *respondeat superior*. *Rode*, 845 F.2d at 1207.

In *Brown*, the Third Circuit set out the factors for a finding of supervisory liability as follows:

> The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

269 F.3d at 216 (citing *Sample v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989)). The court further reiterated that "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she

did." *Brown*, 269 F.3d at 216 (quoting *Sample*, 885 F.2d at 1118). But instead "must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a "relationship between the 'identified deficiency' and the 'ultimate injury.'" *Id.*

Mr. Ward lists seven areas in which he contends that Defendants Miller and Yencha "encouraged, tolerated, ratified, [or]. . . been deliberately indifferent to . . . patterns, practices and customs and the need for more or different training, supervision, investigation or discipline." (*Second Am. Compl.,* ¶ 81.) Mr. Ward alleges "Defendants Miller and Yencha failed to properly sanction or discipline officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other police officers, thereby causing and encouraging the police, including the Defendant officers in this case to violate the rights of citizens such as Mr. Ward." (*Id.* at ¶ 81(g).)

### i.   Colonel Miller

Turning to Colonel Miller, Mr. Ward, while acknowledging that Colonel Miller resigned before May 24, 2009, states "he was ultimately responsible for the training of the Defendant Dughi." (Doc. 112, 11.) In support of his claim, Mr. Ward states that Colonel Miller "[i]n his capacity . . . was aware Trooper Dughi would come in contact and confront individuals who, because they had been drinking, would be loud and boisterous and a decision would have to be made as to whether a crime was committed or not and the degree of force that should be used if crime was committed. He was also aware that the wrong choice by a trooper would cause a deprivation of constitutional rights."(*Id.* at 11-12.) Mr. Ward then states that Trooper Dughi was not properly trained and that lack of training led to the alleged constitutional violations. (*Id.* at 12.) Mr. Ward, alleges this lack of training equates to deliberate indifference on the part of Colonel Miller. (*Id.*) Mr. Ward fails to cite to any evidence of record. Mr. Ward has an obligation to come forward with "affirmative evidence, beyond allegations of the pleadings" in support of the right to relief. *See Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. There is no evidence of record regarding Colonel Miller other than the pleadings. It is undisputed that Colonel Miller had retired from his position as PSP Commissioner on August 8, 2008, prior to the stop of the Ward vehicle at the DUI checkpoint on May 24, 2009. (*Comm. Defs, SMF*, ¶ 63; *Pl' s CSMF-Comm. Defs.*, ¶ 63.)

At best, Mr. Ward makes conclusory allegations which will not suffice in the face of the motion for summary judgment. A recitation of the elements for liability for failure to train is not enough. Mr. Ward fails to demonstrate how there is a genuine issue of fact with regard to the application of those elements. To state that a trooper will come into contact with intoxicated individuals and have to decide if a crime has been committed or not is to paint with too broad of a brush. Mr. Ward has not put forth evidence of a particular situation necessary for liability for failure to train, nor any evidence that could lead to a determination of deliberate indifference by Colonel Miller.

Mr. Ward provides no other argument regarding the supervisory or disciplinary role of Colonel Miller, which is logical because Colonel Miller was not the acting PSP Commissioner on May 24, 2009, nor any time afterwards. Colonel Miller is entitled to summary judgment on all claims.

### ii.    Corporal Yencha

Mr. Ward argues because Corporal Yencha was the PSP supervisor for the troopers on scene on May 24, 2009, "he set the scene for Trooper Dughi's encounter with Mr. Ward." (Doc. 112, 13.) Mr. Ward contends Corporal Yencha "was responsible for defining expected performance by promulgating rules and monitoring adherence to performance standards and individual discipline." (*Id.*) Mr. Ward cites his expert report[16] as support for his position that Corporal Yencha failed to investigate Trooper Dughi's actions. (Doc. 105-19.) However,

---

[16]

Mr. Ward relies on a report by his expert, Dr. Ron Martinelli, to support many of his contentions. (Doc. 105-19.) Mr. Ward's expert opines that Trooper Dughi's actions were "unreasonable and excessive." (*Id.* at 26.) "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Patrick v. Moorman*, 855 F. Supp. 2d 392, 402 (E.D. Pa. 2012) aff'd, 536 F. App'x 255 (3d Cir. 2013) (quoting *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir.2006)). "In a § 1983 suit, 'reasonableness' is practically interchangeable with 'excessiveness.'" *Patrick,* 855 F. Supp. 2d at 402. Because "the boundaries of Rule 704 are often hazy. . . expert testimony becomes impermissible if the expert's opinion would interfere with the district court's 'pivotal role in explaining the law to the jury'". *Id.* (citing *Berckeley,* 455 F.3d at 217.) Thus, Mr. Ward's expert opinion on the reasonableness of Trooper Dughi's actions will be ignored.

Mr. Ward does not direct where such statements are made by his expert and no such statements were found after review of the report.

Mr. Ward states that "[h]ad a proper investigation been conducted, the situation would have warranted disciplinary measures because of the constitutional rights violation engaged in by the Defendant Dughi and injuries inflicted to Mr. Ward . . . the Corporal is liable in his role as a supervisor." (Doc. 112, 14.) Corporal Yencha was not Trooper Dughi's regularly assigned supervisor, nor did he have responsibility for determining or issuing discipline. (*Commw. Defs. SMF*, ¶¶ 58-59; *Pl' s CSMF-Commw. Defs*., ¶¶ 58-59.) Corporal Yencha was the supervisor of PSP troopers working at the DUI checkpoint on May 24, 2009, and upon his return to the checkpoint and upon learning of the incident with Mr. Ward, he filed an "Early Intervention Use of Force Tracking Worksheet." (*Commw. Defs. SMF*, ¶¶ 60-61; *Pl' s CSMF-Commw. Defs*, ¶¶ 59-61.)  Mr. Ward has not cited to any facts of record that could lead a reasonable jury to conclude that Corporal Yencha is liable to Mr. Ward. To state that Corporal Yencha failed to investigate and discipline Trooper Dughi after the fact does not impact the matter at issue in this current litigation. Mr. Ward has done nothing more than to "argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Brown,* 269 F.3d at 216.  Mr. Ward has failed to put forth facts to support his claim against Corporal Yencha and therefore, the motion for summary judgment will be granted.

### iii.    Trooper Blair

Mr. Ward has not advanced a claim for failure to train, supervise, or discipline against Trooper  Blair, therefore, Trooper Blair is entitled to summary judgment with regard to any claim for failure to train, supervise, or discipline.

### iv.    Trooper Dughi

Mr. Ward has not presented evidence with regard to a failure to train, supervise, or discipline claim against Trooper Dughi. It cannot be disputed that Trooper Dughi is one of the individuals whom Mr. Ward alleges violated his constitutional rights, therefore, any claim against Trooper Dughi for failure to train, supervise or discipline, defies logic. Trooper Dughi is entitled to summary judgment on a failure to train, supervise, or discipline claim, as a matter of law.

b.    ***Malicious Prosecution***

i.    **Trooper Dughi**

Mr. Ward contends that Trooper Dughi maliciously prosecuted him in Count I. Mr. Ward alleges that the there was a "violation of his civil rights pursuant to 42 U.S.C. § 1983 and the First and Fourth Amendments of the United States Constitution." (*Second Am. Compl.*) The Commonwealth Defendants move for summary judgment on this claim, arguing that there is no evidence of record to show that Trooper Dughi acted with malice. (Doc. 95, 29.) Mr. Ward counters that there is evidence of record which could lead a reasonable jury to find Trooper Dughi acted with malice. (Doc. 112, 19.) Mr. Ward additionally argues that he brought a Pennsylvania state law claim for the common law tort of malicious prosecution. (Doc. 112, 20-21.) Mr. Ward, however, failed to plead a claim under Pennsylvania law against Trooper Dughi and cannot now add a claim that was not alleged in the Second Amended Complaint.[17] Therefore, Mr. Ward's malicious prosecution claim against Trooper Dughi will be evaluated as a claim brought pursuant to the Fourth Amendment.

The Third Circuit stated in *Johnson v. Knorr* that:

> To prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

477 F.3d 75, 81-82 (3d Cir. 2007). "If Plaintiffs have not proffered evidence sufficient to create a triable issue of fact as to all five prongs, their malicious prosecution claim must fail as a matter of law." *Domenech v. City of Philadelphia*, 2009 WL 1109316, at *9 (E.D. Pa.

---

[17]

"[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Village Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citation omitted); *see also Dewees v. Haste*, 620 F. Supp. 2d 625, 635 (M.D. Pa. 2009) ("to the extent Plaintiff is attempting to expand upon his original allegations through argument in his brief it is impermissible."); *Anderson v. Consol-Pennsylvania Coal Co.*, 740 F. Supp. 1126, 1130 (W.D. Pa. 1990) ("we will not allow plaintiffs to expand their theory of the case at this late date in an effort to avoid summary judgment.").

Apr. 23, 2009) aff'd, 373 F. App'x 254 (3d Cir. 2010).

### 1.    Initiation of Prosecution and Criminal Procedure

Trooper Dughi was the affiant who filed charges against Mr. Ward of Disorderly Conduct, 18 Pa. C.S.A § 5503(A)(1), graded as misdemeanor of the third degree, and Resisting Arrest, 18 Pa. C.S.A. § 5104, graded as misdemeanor of the second degree. (Doc. 94, *Commw. Defs. SMF*-Ex I.) After a jury trial, Mr. Ward was acquitted of all charges. (*Second Am. Compl.,* ¶ 56.; Doc. 43, *Commw. Defs. Ans.,* ¶ 56.) The first two prongs are not in dispute.

### 2.    Initiated without Probable Cause

Turning to the third prong, the Commonwealth Defendants have not advanced any argument with regard to whether or not Trooper Dughi had probable cause to arrest Mr. Ward. Trooper Dughi needed probable cause to arrest for disorderly conduct because a resisting arrest charge could not have provided probable cause *ab intitio*. "[A] valid charge of resisting arrest requires an underlying lawful arrest, which, in turn, requires that the arresting officer possess probable cause." *Com. v. Hock*, 556 Pa. 409, 415, 728 A.2d 943, 946 (1999). There must have been an underlying basis for arrest that Mr. Ward would be allegedly resisting, *i.e.,* probable cause for an arrest for disorderly conduct. Mr. Ward was charged with violation of 18 Pa. C.S.A. § 5503(a)(1) according to the Magisterial District Court Docket Transcript.  (*Commw. Defs. SMF*-Ex. I.) However, as stated Commonwealth Defendants do not address probable cause and because Mr. Ward's claim against Trooper Dughi for unlawful arrest remains, the jury will be tasked with determining whether or not probable cause existed.

### 3.    Malice

Commonwealth Defendants argue that they are entitled to summary judgment because Mr. Ward has failed to provide evidentiary support that Trooper Dughi acted maliciously. (Doc. 95, 30.) The Third Circuit has stated that "malice can mean ill-will *or* the use of a prosecution for an extraneous purpose *or* a lack of belief in the guilt of the accused." *Lippay v. Christos*, 996 F.2d 1490, 1503 (3d Cir. 1993). Additionally, malice can be shown "either [by] stat[ing] a deliberate falsehood or act[ing] with a reckless disregard for the truth. Proof of negligence or innocent mistake is insufficient." *Id.* at 1501 (citing

*Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674 (1978)). Malice may be inferred from the absence of probable cause. *Lippay*, 996 F.2d at 1502 (citations omitted).

Mr. Ward's asserts that "the evidence of record clearly supports a finding that Trooper Dughi acted with malice." (Doc. 112, 22.) Mr. Ward cites his wife's deposition testimony that "she detected an attitude of anger." (*Id.*) Mrs. Ward testified that she "could see he was getting angry." (Doc 105-15, 10.) Also, Mr. Ward cites to Trooper Dughi's actions after Mr. Ward's door was opened, *e.g.*, trying to remove him from the vehicle and the Taser applications, as evidencing malice. (Doc. 112, 23.)

Mr. Ward argues that because his expert determined that Trooper Dughi lacked probable cause to arrest for disorderly conduct, "a jury could infer malice therefrom." *Id.*[18] Viewing the evidence in the light most favorable to Mr. Ward, there remains a question of fact whether Trooper Dughi acted with malice. A jury could infer malice if they agree that Trooper Dughi lacked probable cause. However, because Mr. Ward has failed to plead a Pennsylvania state law claim for malicious prosecution, this does not end the inquiry.

### 4.     Deprivation of liberty consistent with seizure

When a malicious prosecution claim is brought under the Fourth Amendment, "the plaintiff [must have] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson*, 477 F.3d at 81-82.   This fifth element distinguishes Fourth Amendment malicious prosecution claims from Pennsylvania common law malicious prosecution. *See Collins v. Jones,* — F. 3d. — , 2015 WL 790055 * 4 n.10 (E.D.Pa., February 24, 2015). "Pretrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure."   *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) (no seizure resulted where plaintiffs were issued only a summons and did not have to post bail). In *Gallo v. City of Philadelphia,* 161 F. 3d 217 (3d Cir. 1998), the plaintiff was seized when he was required to post $ 10,000 bond, attend all court hearings, contact pretrial services weekly and was prohibited from

---

[18]

 Because the issue of probable cause is not the ultimate issue with regard to this claim, Mr. Ward's expert's opinion that Trooper Dughi acted without probable cause will be considered.

traveling outside of a two state area. In *Johnson,* a seizure was found where the plaintiff was detained for approximately two days prior to making bail, and was also required to return in six weeks for a hearing. 477 F.3d 75.

Mr. Ward sets forth that "deprivation of liberty is not an element for the state law cause of action" and that he can recover based upon the state law cause of action." (Doc. 112, 25.) However, as discussed above, Mr. Ward fails to plead a claim under Pennsylvania law as he states in the Second Amended Complaint that his claims are pursuant to the First and Fourth Amendments to the United States Constitution. Mr. Ward fails to set forth any evidentiary support demonstrating that he was seized for Fourth Amendment purposes thus leading to the conclusion that Trooper Dughi is entitled to summary judgment on Mr. Ward's malicious prosecution claim.

### 5.    Lack of Proximate Cause

Commonwealth Defendants argue against the malicious prosecution claim contending that Trooper Dughi's actions were not the proximate cause of Mr. Ward's injuries. (Doc. 95, 32-35.) Commonwealth Defendants argue that Mr. Ward's arraignment and preliminary hearing break the causal chain with regard to malicious prosecution. Because it was determined above that Mr. Ward has not come forward with evidence of a seizure as required, this argument will not be explored. Trooper Dughi is entitled to summary judgment on Mr. Ward's malicious prosecution claim.

### ii.    Trooper Blair

Mr. Ward has not presented evidence with regard to a malicious prosecution claim against Trooper Blair. The evidence is clear that Trooper Dughi initiated the criminal proceedings against Mr. Ward and therefore, Trooper Blair is entitled to summary judgment on a malicious prosecution claim as a matter of law.

### a.    *Lack of Duty*

### i.    Trooper Blair

Commonwealth Defendants seek summary judgment on behalf of Trooper Blair on all Mr. Ward's claims because "[e]ven though Trooper Blair was present at Ward's arrest, Ward clearly stated during his deposition that Trooper Blair did not injure him." (Doc. 95, 41.) Commonwealth Defendants argue that tort principles of damages are applicable to

actions brought pursuant to § 1983 and therefore, because Mr. Ward stated Trooper Blair did not cause him injury, he cannot be liable to him for damages. (*Id.*) Mr. Ward responds to Commonwealth Defendants' motion stating that Trooper Blair was on his right hand side, with a hold on his right arm. (Doc. 112, 27; Doc. 105-7, 49-50, 59.) Mr. Ward testified that he suffered injury to his right biceps tendon. (Doc. 105-1, 38.) Despite Mr. Ward's statement that Trooper Blair did not cause injury to him, there remains a question of fact with regard to whether Trooper Blair played a role in causing injury to Mr. Ward. Therefore, Trooper Blair is not entitled to summary judgment based on a lack of duty to Mr. Ward.

### b.   *Qualified Immunity*

### i.   **Trooper Blair**

Commonwealth Defendants alternatively argue Trooper Blair should be entitled to summary judgment on Mr. Ward's unlawful or false arrest claim based on qualified immunity. (Doc. 95, 42.) "The Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause." *Rogers,* 120 F.3d 446, 452 (3d Cir. 1997) (citing *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995)) (citation omitted).  I agree Trooper Blair is entitled to qualified immunity on Mr. Ward's unlawful and false arrest claim. However, I will explore whether probable cause existed for Mr. Ward's arrest.[19]

A defendant official may be entitled to qualified immunity or a good faith, affirmative defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982). The defense has both an objective and a subjective aspect, with the objective aspect involving a "presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" *Id.* at 815, 2736 (quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S. Ct. 992, 1001, 43 L. Ed.2d 214 (1975)). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct.

---

[19]

At summary judgment, "crucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." *Grant v. City of Pittsburgh,* 98 F.3d 116, 122 (3d Cir.1996).

2042, 2044, 192 L. Ed. 2d 78 (2015) (quoting *Reichle v. Howards,* 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)). "In considering the applicability of qualified immunity, courts engage in a two-pronged examination[:] [f]irst, a court must decide 'whether the facts that a plaintiff has ... shown make out a violation of a constitutional right'" and "second, the court must determine 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015), *petition for cert. filed*, 800 F.3d 633 (U.S. November 3, 2015) (No. 15-571) (citing *Pearson v. Callahan,* 555 U.S 233, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "Courts may begin their consideration with either prong." *Pearson,* 555 U.S at 236. "[T]he most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was reasonably mistaken about the state of the law." *Curley v. Klem*, 499 F.3d 199, 214 (3d Cir. 2007). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093, 182 L. Ed at 985. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *Id*. The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044. "Summary judgment is appropriate if no reasonable juror could conclude that [the plaintiff]'s clearly established rights were violated." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).

"Where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." *Rogers*, 120 F.3d at 455. The inquiry has two parts: first, did the officer's conduct violate clearly established law? Secondly, did the officer "nevertheless reasonably believe that his conduct was lawful in light of the information he possessed at the time?" *Berg,* 219 F.3d at 272.

The Commonwealth Defendants argue that it was objectively reasonable for Trooper

Blair to assist Trooper Dughi in the arrest based on his observations.[20] (Doc. 95, 43.) Trooper Blair indicated that Mr. Ward was shouting and using vulgarities when he first encountered the vehicle, and, after the vehicle was off the roadway, he continued to hear yelling, despite not being able to hear what was being said. (Id. at 42; Doc. 94, Commw. Defs., Ex.C, 7, 22-23.) When Trooper Blair heard Trooper Dughi tell Mr. Ward to get out of the car and then tell Mr. Ward that he was under arrest, he approached to see what was going on. (Id. at 42; Doc. 94, Commw. Defs., Ex.C, 7, 22-23.) Commonwealth Defendants argue that Trooper Blair reasonably relied on his observations of Mr. Ward as well as Trooper Dughi's statement to Mr. Ward that he was under arrest and thus should be entitled to qualified immunity on the unlawful or false arrest claim.  (Doc. 95, 43.) Mr. Ward argues that because Trooper Dughi did not have probable cause to arrest Mr. Ward based on the applicable Pennsylvania disorderly conduct statute,[21]  Trooper Blair could not objectively

---

[20]

Commonwealth Defendants do not address whether or not there was a constitutional violation. They contend that Trooper Blair's actions were reasonable without addressing whether or not Trooper Dughi had probable cause to arrest.

[21]

Mr. Ward cites to Pennsylvania law with regard to the Disorderly Conduct statute, 18 Pa. C.S.A. § 5503. Mr. Ward addresses Sections (2) and (3). However, the magisterial docket transcript, attached an exhibit to Commonwealth Defendants' Statement of Facts (Doc. 94, Ex. 9.), lists the offense charged as 5503(a)(1)*. The statute in its entirety provides the following:

(a) Offense defined.--A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) engages in fighting or threatening, or in violent or tumultuous behavior;

(2) makes unreasonable noise;

(3) uses obscene language, or makes an obscene gesture; or

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

(b) Grading.--An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable

rely on the statement of Trooper Dughi to Mr. Ward that he was under arrest. (Doc. 112, 30-33.) Mr. Ward references Trooper Blair's deposition testimony for the contention that Trooper Blair did not know what had been said in the vehicle. (*Id.* at 33.) Commonwealth Defendants counter that because "the situation could have escalated in any number of ways," Trooper Blair relied on Trooper Dughi's assertion that Mr. Ward was under arrest and Mr. Ward's refusal to exit the vehicle." (Doc. 118, 30.)

Under Pennsylvania law, the Pennsylvania Supreme Court has stated: "whether a defendant's words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." *Com. v. Hock*, 556 Pa. 409, 415-16, 728 A.2d 943, 946 (1999) (holding that the statement "F___ you, you a__h___" when made to a police officer did not constitute fighting words). Additionally, "[w]hen the regulated conduct consists of speech, . . .  the statute must 'be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.'" *Gilles v. Davis,* 427 F.3d 197, 204 (3d Cir. 2005) (quoting *Johnson v. Campbell,* 332 F.3d 199, 211 (3d Cir.2003)) (citations omitted). "Speech that does not receive First Amendment protection, in turn, 'include[s] the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words.'" *Gilles,* 427 F.3d at 204 (citing *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766 (1942)). Fighting words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769.

---

warning or request to desist. Otherwise disorderly conduct is a summary offense.

**(c) Definition.**--As used in this section the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public.

18 Pa. C.S.A. § 5503. There is no evidence of record to indicate that the charge was not filed under 5503(a)(1) and review of the Pennsylvania Court of Common Pleas Docket Sheet indicates a charge under 5503(a)(1).

In *Gilles*, the district court's determination that the officer was entitled to qualified immunity was affirmed where the plaintiff singled out an individual with comments that the court deemed "especially abusive and constituted fighting words." 427 F. 3d at 205. Reasoning that where a police officer is confronted by words "akin to a racial slur" and "with little time to parse" the speech, it was not unreasonable to believe the plaintiff engaged in disorderly conduct." *Id.* at 206. In *Tate v. West Norriton Twp.,* 545 F. Supp. 480 (E.D.Pa 2008), the court held that where the plaintiff stated "she needs f__ing help" and, after being ordered to stop using profanity, responded "[w]hat the f__k word?", the officer did not have probable cause to arrest the plaintiff for a violation of Pennsylvania's disorderly conduct statute outlawing "obscene" words. Albeit in dicta, the court went on to further state that such words also did not constitute "fighting words" as outlawed by section 5503(a)(1). *Id.* at 487.

In the current case, it is undisputed that Mr. Ward remained in the vehicle while statements were made. Additionally, the vehicle was pulled off to the side of the roadway. The statements by Mr. Ward "I've been f—ing drinking", 'this is f—ing bulls—", and "I'll shut my mouth", do not rise to the level of fighting words. Such phrases, although certainly can be considered offensive, do not by themselves inflict injury nor can it be said they will bring about an immediate breach of peace. Therefore, the use of such words does not lead to probable cause to arrest for disorderly conduct. However, that does not end the inquiry with regard to Trooper Blair. Even if Mr. Ward has presented evidence that there was a violation of his constitutional rights, Trooper Blair can still be entitled to qualified immunity if his actions were objectively reasonable in light of what was available to him at the time.

In *Rogers*, a police officer was told by a probation officer, who was no longer supervising the plaintiff, that another county may have a detainer or warrant for the plaintiff. 120 F.3d 446. No such warrant existed but the officer took steps and made contacts to bring the plaintiff into custody. *Id.* at 451. When the plaintiff filed suit under § 1983 and the officer raised a qualified immunity defense based on the statements made to him,  the court stated that: "[t]he relevant question is whether it was objectively reasonable for [the officer] to believe, on the basis of the statements, that probable cause existed for the arrest." *Id.* at 455. The court determined that, "in the absence of any statement confirming the existence

of probable cause or a warrant itself," the officer was not entitled to qualified immunity because reliance on the statement under the circumstances was not reasonable. *Id.* In *Dull v. W. Manchester Twp. Police Dep't,* an officer who misinterpreted another officer's statement to take the plaintiff to the station as an instruction to arrest, opposed to the intended desire to take her to the station for questioning, was deemed to be entitled to qualified immunity. 604 F. Supp. 2d 739 (M.D. Pa. 2009). Finding the officer could have reasonably believed he was being instructed to detain the plaintiff, the officer's actions were objectively reasonable, allowing for qualified immunity on unlawful arrest and unlawful imprisonment claims. *Id.* at 752. The court reasoned that "guileless misunderstandings that result from spur-of-the-moment decision-making are not the type of pernicious constitutional violations that vitiate qualified immunity." *Id.* at 753.

In the current case, Trooper Blair's reliance on Trooper Dughi's statement to Mr. Ward that he was under arrest was objectively reasonable to invoke qualified immunity. Despite the fact that Trooper Dughi did not have probable cause for the underlying arrest, it was not unreasonable for Trooper Blair to rely on the statement of a fellow trooper declaring an arrest. The entire matter spanned a very short period of time. Although Mr. Ward presented evidence that he asked Trooper Dughi what he was being arrested for but did not receive a response (Doc. 105-7, *Pl's-CSMF–Commw. Defs*., Ex.G, 24.), no evidence has been presented that Trooper Blair knew Trooper Dughi did not have probable cause for arrest. Therefore, it was reasonable to rely on a statement of a fellow trooper when an encounter occurred outside of his immediate presence.  I agree with Judge Conner's statement that:

> While probable cause for an arrest cannot arise from an officer's erroneous statements to fellow officers, those who reasonably rely on inaccurate representations are nevertheless entitled to qualified immunity. The immunity thus prevents the inequitable situation that would result if an officer were held liable for reasonably relying on statements whose accuracy he or she has no expedient means of verifying.

*Dull,* 604 F. Supp. at 752, n. 8. This case falls within the ambit of the above language. Therefore, Trooper Blair is entitled to qualified immunity on Mr. Ward's unlawful or false arrest claim.

### 2. COUNT II–Towanda Defendants

Towanda Borough and Defendant Officers John Strozyk and James Hart move for summary judgment on Mr. Ward's claims against them. However, Officers Strozyk and Hart fail to address Mr. Ward's claim of unlawful arrest made against them and their motion for summary judgment is devoid of mention of the claim. Mr. Ward's Second Amended Complaint states "That the Defendants Strozyk and Hart participated in the arrest of Mr. Ward, since their actions restricted his freedom of movement, forcing him to remain at the scene while the Defendant Dughi illegally arrested Mr. Ward." (*Second Am. Compl.*, ¶ 87.) Therefore, Mr. Ward's claim for unlawful or false arrest against Officers Strozyk and Hart remains.

### a.   *Excessive Force*

Officers Strozyk and Hart move for summary judgment on Mr. Ward's claims against for use of excessive force. (Doc. 82; *Second Am. Compl.,* Count II.) Officers Strozyk and Hart argue that Mr Ward "admitted that Stroyzk's efforts in holding his head was an assistive measure so as to prevent Ward from hitting the ground." (Doc. 86, 7-8.) They further argue that the "record is entirely silent as to any unreasonable use of force by Officer Hart", additionally citing to Mr. Ward's testimony that Officer Hart helped Mr. Ward to the ground. (*Id.*) Mr. Ward responds that Defendants' claim ignores evidence that Officers Strozyk and Hart grabbed Mr. Ward's arms and pulled them behind him to be handcuffed. (Doc. 106, 7.)

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, will not be violated. . . ." U.S. Const. amend. IV.   "A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable," *Curley,* 298 F.3d at 279 (citing *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999)), and "[t]he use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment," *Couden v. Duffy,* 446 F.3d 483, 496 (3d Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004)). "In deciding

whether challenged conduct constitutes excessive force, a court must determine the objective 'reasonableness' of the challenged conduct, considering 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Couden*, 446 F.3d at 496-97 (quoting *Carswell*, 381 F.3d at 240). "Other factors include 'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" *Couden*, 446 F.3d at 497 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)). This standard is one of objective reasonableness, and looks to "'the reasonableness of the officer's belief as to the appropriate level of force[,]' which 'should be judged from [the officer's] on-scene perspective,' and not in the '20/20 vision of hindsight.'" *Curley*, 499 F.3d at 206 (quoting *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).  Courts are instructed to "take into consideration the fact that 'police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation.'" *Couden*, 446 F.3d at 497 (quoting *Graham*, 490 U.S. at 397, 109 S. Ct. 1865)).

"[R]easonableness under the Fourth Amendment should frequently remain a question for the jury." *Geist v. Ammary*, 40 F. Supp. 3d 467, 476 (E.D. Pa. 2014) appeal dismissed, No. 14 3966, 2015 WL 4366795 (3d Cir. July 16, 2015) (quoting *Abraham v. Raso,* 183 F.3d 279, 290 (3d Cir.1999)). "Summary judgment may be possible, however, if the officer's use of force was objectively reasonable under the circumstances after all factual disputes have been resolved in favor of the plaintiff" and "[t]he use of a Taser during an arrest,. . . may be reasonable." *Id.*

"Determining whether the force used to effect a particular seizure is 'reasonable' ... requires ... careful attention to the facts and circumstances of each particular case," *Brown v. Cwynar,* 484 F. App'x 676, 679 80 (3d Cir. 2012) (quoting *Graham,* 49 U.S. 396.) Therefore, the factual scenario underlying the claim must be evaluated. In an unpublished opinion, the Third Circuit held in *Patrick v. Moorman*, 536 F. Appx. 255 (3d Cir. 2013), that the use of a taser against a fleeing alleged bank robber was reasonable and in line with the

controlling policy of the department. *Id.* at 259. Again, in an unpublished opinion, the Third Circuit affirmed a grant of summary judgment finding that the officer was reasonable in employing a taser when dispatched to the scene for assistance with a reported scuffle with an officer; the officer arrived to find the plaintiff scuffling with an officer; the officer had been told the plaintiff had been tased prior but continued to resist; and he observed the plaintiff, lying on the ground, refusing to release his hands. *Brown*, 484 F. App'x at 680. The court determined the amount of force was proportional to the threat, stating that "information supplied [the officer] a reasonable basis to conclude that [the plaintiff] would continue to resist arrest and to act belligerently towards the police were he not subdued" and the reasonableness was bolstered by the fact that the officer had warned the plaintiff that he would be tased if he did not comply. *Id.* In *Geist v. Ammary*, the court found that summary judgment was not appropriate where an officer tased a juvenile. 40 F. Supp at 478. There were conflicts in the accounts of the officer and the plaintiff with regard to the overall surrounding circumstances, the plaintiff's behavior, whether any or what types of warnings were given to the plaintiff, what happened after the tasing and the placement of plaintiff's bag on her body. *Id.* at 481-82. The court declined to allow qualified immunity because "[s]everal facts material to the determination of reasonableness remain in dispute." *Id.* at 485.

Defendants Strozyk and Hart argue there is no evidence of record to show that they exerted any force against Mr. Ward, let alone excessive force. (Doc. 86, 8.) Mr. Ward counters the Defendants' argument by stating that he received injury as a result of being placed into the handcuffs.(Doc. 106, 7.) Mr. Ward's complaint alleges:

> That as a result of the actions of the Defendants, in addition to the excruciating pain and immobilization of his body caused by the tasering and the excessive and unreasonable physical force, the Plaintiff David Ward suffered the following injuries:
> A.   Rupture of the belly of the biceps muscle of the right arm;
> B.   Deformity of the biceps muscle of the right arm;
> C.   Complete rotator cuff tear in the left shoulder; and
> D.   Split of biceps tendon in the left arm."

(*Second Am. Compl.*, ¶ 66.) Mr. Ward argues that the officers' argument "ignores the evidence that both Strozyk and Hart grabbed the Wards [sic] arms and pulled them up

behind him and handcuffed him at the same time that he was being actively tasered by Trooper Dughi." (Doc. 106, 7.)

The question to be answered is whether the actions taken by Officers Strozyk and Hart were reasonable based on the totality of circumstances. There is no dispute that Officers Strozyk and Hart did not deploy the Taser on Mr. Ward. To limit the inquiry to just the application of the Taser, however, would be to take too narrow a view of the incident. Mr. Ward alleges he was injured during the course of the arrest and therefore, where he has presented evidence that the Officers possibly used excessive force in securing him, those claims will survive summary judgment. It is clear that the officers did participate in securing Mr. Ward and also in bringing him to the ground after he was Tased while standing. Mr. Ward testified he was not resisting arrest contrary to what has been stated by the officers involved. (Doc. 105-3, Ex. A*, Ward Deposition*, 227.) He additionally testified that he was unable to comply with commands because, at first, he was seat-belted and then was drive-stunned with one leg outside the car, causing him to hang on to the car door.(*Id.* at 228.) After the first Taser deployment, Mr. Ward was brought to the ground and was then Tased when he was lying face down. Trooper Dughi testified he became rigid after the first Taser deployment and also when lying face down and Tased again. (Doc. 105-3, Ex. K, *Dughi Deposition,* 156-58; 176.)

There were four officers surrounding Mr. Ward and there is no allegation that the officers had any suspicion that he was armed. Defendants testified he was not compliant (Doc. 105-3, Ex. K, *Dughi Deposition,* 176; Ex. G, *Blair Deposition,* 22-23*;* Ex. F, *Hart Deposition,* 42-44), however, there is no factual citation that Mr. Ward, at any point, was attempting to counter officers attempts to take him into custody with force. Officer Hart did state that Mr. Ward was struggling with the officers and attempting to shake them off. (*Hart Deposition*, 42-44) but did not reference any specific actions by Mr. Ward in an effort to resist. Viewing the evidence in a light most favorable to Mr. Ward and based on the nature of the alleged crime,  the amount of officers present, and Mr. Ward's contention that he was not resisting arrest,  questions of fact remain whether the force used to take Mr. Ward into custody was reasonable, and therefore, summary judgment is not appropriate. Officers Strozyk and Hart are not entitled to summary judgment on Mr. Ward's excessive force

claim.

### b.   *Failure to intervene*

Officers Strozyk and Hart move for summary judgment on Mr. Ward's claims that they are liable to him for failing to intervene and argue that the force used was reasonable under the circumstances, contending that no excessive force was used, and alternatively, that they had no real or reasonable opportunity to intervene. (Doc. 86, 9.) Mr. Ward counters that the officers had a duty and an opportunity to intervene, yet failed to do so. (Doc. 106, 13.) "Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "[A] failure to intervene claim requires the existence of a constitutional violation." *Bryant v. City of Philadelphia*, 890 F. Supp. 2d 591, 601 (E.D. Pa. 2012), aff'd (Mar. 15, 2013). "[I]f a police officer is present when another officer violates a citizen's constitutional rights, the first officer is liable under § 1983 if that officer had reason to know that a constitutional violation, such as excessive force, was being used, and that officer had 'a reasonable and realistic opportunity to intervene.'" *Id*. (citing *Smith,* 293 F.3d at 651).

Officers Strozyk and Hart argue that they did not have a realistic and reasonable opportunity to intervene stating "Plaintiff has adduced no evidence that Strozyk or Hart had a reasonable opportunity to intervene prior to Dughi's use of the Taser." (Doc. 86, 9-10.) On behalf of Officer Hart, it is argued that there has been no evidence that Officer Hart confronted a "situation that warranted his involvement." (*Id.* at 10.) Mr. Ward responds that Officer Hart was present from the time Mr. Ward was being removed from the vehicle and stepped aside when the Taser was being deployed. (Doc. 106, 9-10.)

Despite their presence, Mr. Ward has not come forward with any evidence of record to demonstrate that Officers Strozyk and Hart had a reasonable opportunity to intervene and stop Trooper Dughi from using the Taser.[22] Mr. Ward conflates his argument with regard to

---

[22]

   Both the Towanda Defendants and Mr. Ward limit the claim of failure to intervene to the use of the Taser. (Doc. 86, 8-10; Doc. 106, 9-13.) Therefore, the claim will only be evaluated with regard the application of the Taser by Defendant Dughi.

the use of excessive force and the duty to intervene. There is no evidence of record that Officers Strozyk and Hart had a realistic and reasonable opportunity to intervene before the Taser applications by Trooper Dughi. Therefore, Officers Strozyk and Hart are entitled to summary judgment on Mr. Ward's claims for failure to intervene.

### c.   *Qualified immunity*

Officers Strozyk and Hart move for summary judgment on the claims against them arguing they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials are immune from suit for damages where their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson,* 555 U.S at 231 (internal quotations omitted) (quoting *Harlow*, 457 U.S. at 818). Qualified immunity protects government officials whether they have made a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Id.* To determine whether qualified immunity applies, a court must examine "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (internal citations omitted). A court may exercise its discretion in choosing which prong to address first, considering the circumstances of the particular case. *Id.* at 236.

Based on disputed issues as to whether the force used to arrest Mr. Ward was reasonable and  the denial of Officer Strozyk and Hart's motion for summary judgment on Mr. Ward's claim for excessive force, I cannot determine that they are entitled to qualified immunity. Because the privilege is "an immunity from suit rather than a mere defense to liability," *Pearson,* 555 U.S. at 237, courts should address the issue of qualified immunity "at the earliest possible stages of litigation," *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 242 n.7 (3d Cir. 2008). But "[a] decision on qualified immunity will be premature when there are unresolved disputes of historical facts relevant to the immunity analysis." *Curley*, 298 F.3d at 278. Because there is a disputed issue of fact material to the qualified immunity determination, Officers Strozyk and Hart's motion will be denied on Mr. Ward's excessive force claim.

Because I will grant Officers Strozyk and Hart's motion for summary judgment on Mr. Ward's failure to intervene claim, a determination regarding qualified immunity is unnecessary.

### d.    *Punitive Damages and Monell claim*

Towanda Defendants have moved for summary judgment on Mr. Ward's request for relief in the form of punitive damages as well as the *Monell* claim alleged against Towanda Borough. (Doc. 82, ¶¶ 6-7.) Mr. Ward concurs that summary judgment is appropriate with regard to the *Monell* claim and therefore, the motion for summary judgment filed by Towanda Defendants is granted.

Mr. Ward additionally concedes that he is precluded from seeking punitive damages from Towanda and Canton Boroughs. (Doc. 108, 9; Doc. 106, 15.) The Third Circuit has stated "a municipality is immune from punitive damages under 42 U.S.C. § 1983," *Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011)(citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L. Ed.2d 616 (1981)). Because Mr. Ward cannot be granted punitive damages, summary judgment is proper on behalf of the Canton Borough and the Towanda Borough on the respective requests for such relief in Counts II and III.

Mr. Ward states that he is not seeking punitive damages against any of the Towanda Defendants. (Doc. 106, 15.) Punitive damage are available "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983). Because Mr. Ward has not presented evidence of conduct by Officers Strozyk and Hart necessary for a punitive damages award, the motion for summary judgment will be granted.

### 3.    COUNT III-Canton Defendants

### a.    *Failure to Intervene and Failure to Supervise*

### i.    Chief Seeley

Mr. Ward alleges that Chief Seeley is liable to him for failing to intervene during the

May 24, 2009 incident. (*Second Am. Compl.*, ¶101.) However, Mr. Ward concedes that the record does not support a claim against Chief Seeley for failing to intervene because it is not disputed that he was in the bingo hall throughout the time Mr. Ward was in contact with Troopers Dughi and Blair and Officers Strozyk and Hart. (Doc. 108, 7.) Therefore, summary judgment will be granted on behalf of Chief Seeley on Mr. Ward's claim in Count III for failure to intervene.

In Mr. Ward's reply brief, despite acknowledging Chief Seeley was not involved in the stop of the Ward vehicle, he alleges Chief Seeley unconstitutionally failed to supervise by delegating his supervisory role to Lance Larcom[23] and also for his role in requesting a DUI checkpoint and for the location selection. (Doc. 108, 6-7.) As discussed above, for supervisory liability to attach, a plaintiff must demonstrate either the supervisor directed the subordinate to take an unlawful action; acquiesced in the unlawful action when he knew it was occurring; implemented an unlawful practice, or policy; or failed to correct a practice or policy that led to unlawful acts. *See A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d at 586; *Brown,* 269 F.3d at 216. Mr. Ward has failed to demonstrate that Chief Seeley instituted an unlawful checkpoint, as discussed below. Mr. Ward has also failed to put forth evidence that Chief Seeley directed, knew of, or acquiesced in any conduct that may have led to a violation of Mr. Ward's constitutional rights. Therefore, Chief Seeley is entitled to judgment as a matter of law on Mr. Ward's failure to supervise claim.

### b. *DUI Checkpoint*

### i. **Chief Seeley and Canton Borough**

Mr. Ward fails to expand on any alleged unconstitutionality of the DUI checkpoint in his Second Amended Complaint. However, he argues at length that the DUI checkpoint was an unconstitutional seizure in both his brief in opposition to the motion for summary judgment filed by the Canton Defendants (Doc. 108, 7-13.) and also in his brief in opposition

---

[23]

     Lance Larcom is not a party to this litigation. He was the officer in charge for Canton Borough at the DUI checkpoint on May 23-24, 2009. (Doc. 105-16, Ex.T, *Larcom Deposition*,14, 1.)

to the motion filed by the Commonwealth Defendants (Doc. 112, 18-20.). Mr. Ward alleges that because the DUI checkpoint was requested by Canton Borough and Chief Seeley and was a "sham" checkpoint, Chief Seeley is liable to Mr. Ward. (Doc. 108, 8.) For the reasons that follow, Defendants' motions for summary judgment will be granted on Mr. Ward's claim that the DUI checkpoint amounted to an unconstitutional seizure under the Fourth Amendment.

Construing Mr. Ward's allegation that "Defendants in this case violated the following clearly established and well settled constitutional rights of Plaintiff David Ward: a.) Freedom from unreasonable seizure of his person" to be a Fourth Amendment challenge to the DUI checkpoint, such a claim fails to withstand summary judgment. Mr. Ward's contention appears to be that because he asserts the DUI checkpoint was unconstitutional and because Chief Seeley and the Commonwealth Defendants participated in the set up or manning of the checkpoint in some way, they are liable to him for an unconstitutional seizure.

Mr. Ward argues that Chief Seeley, along with Canton Borough

> were responsible for requesting the DUI checkpoint and selecting the location of the checkpoint when they knew that they were unlikely to encounter any drunk drivers and the sole reason for the checkpoint was to give an opportunity for overtime work for the members of the Canton Borough police and officers of other police agencies that was paid for by the federal government.

(Doc. 108, 7.) Mr Ward asserts Chief Seeley "is the policy maker responsible for both establishing the location and time of the DUI checkpoint, and for continuing to hold the checkpoint at the same place, when the statistics do not justify the seizures of persons stopped at the checkpoint." (*Id.* at 13.)

Mr. Ward has not presented evidence, other than his assertions, that the statistics do not support the checkpoint, however, resolution of whether the checkpoint amounted to an unconstitutional seizure will ultimately determine the liability of Chief Seeley and Canton Borough.  In *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S. Ct. 2481, 2488, 110 L. Ed. 2d 412 (1990*),* the Supreme Court stated, in evaluating checkpoints, there is to be a "balance of the State's interest in preventing drunken driving, the extent to which

this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped." The Court went on to hold that a checkpoint that stopped one hundred and twenty six vehicles for an average of twenty five seconds and resulted in two arrests for drunk drivers, was not an unreasonable seizure. *Id.* at 448, 455; 2484, 2487-88.

Mr. Ward alleges that the checkpoint "did not meet the **Blouse-Tarbert** guidelines adopted by the Pennsylvania Supreme Court. (Doc. 108, 8.) In *Commonwealth v. Blouse*, 521 Pa. 167, 611 A. 2d 1177 (1992), the court adopted the guidelines set forth by the plurality opinion of *Commonwealth v. Tabert*, 517 Pa. 277, 535 A. 2d 1035 (1987) for assessing the constitutionality of a checkpoint under the Pennsylvania Constitution. The guidelines are as follows:

> [T]he conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.

*Blouse*, 531 Pa. at 172, 611 A.2d at 1180 (citing *Tarbert,* 517 Pa. at 293, 535 A.2d at 1043). The court further stated "[s]ubstantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level." *Id.* Despite Mr. Ward's statement that the checkpoint resulted in an unreasonable seizure in violation of his Fourth Amendment rights, he has failed to expand on how the checkpoint did not meet the criteria set forth by the United States Supreme Court or the Pennsylvania Supreme Court.

Mr. Ward places great emphasis on the fact that Sergeant Lance Larcom answered affirmatively when asked "So that the chief determinant then of having the checkpoint at this

location is not the number of arrests for DUI, but because that's the only place you could have it in the borough, correct?" (Doc. 105-16, 29.) More broadly, Sergeant Larcom does state that "there's nowhere else to conduct it in Canton that you can get cars to pull - - you know, pull them off the road or have any kind of room to hold a checkpoint." (*Id*.) Sergeant Larcom also stated the need to have signage that is visible from a distance as another reason to place the checkpoint in the selected location. (*Id.)* However, Mr. Ward states that Mr. Larcom testified that the number of DUI arrests was irrelevant. (Doc. 108, 5.) This is a mischaracterization of his deposition testimony and does not demonstrate there is a material issue of fact regarding the checkpoint. Mr. Ward asserts that Chief Seeley knew that there was no statistical reason supporting the time and place of the checkpoint, but Mr. Ward has not presented any evidence that Chief Seeley was aware of such. Notably, Mr. Ward cites to the same statistics relied upon by the Defendants to justify the checkpoint and provide no alternatives. There are no disputes of material issues of fact to be resolved by a jury.

### ii.    Commonwealth Defendants

In Mr. Ward's brief in opposition to the Commonwealth Defendants' motion for summary judgment, he argues that summary judgment is not appropriate for the Commonwealth Defendants because "there exists questions of fact which must be decided by a jury." (Doc. 112, 16.)  First, Mr. Ward states Chief Osman[24] was not at the checkpoint so could not verify that stops of motorists were in fact brief. (Doc. 112, 14.) However, Mr. Ward fails to point to any evidence that the stops were not brief. Secondly, Mr. Ward argues that because Corporal Andrascik[25] was not at the checkpoint on May 24, 2009, his deposition testimony cannot be credited with regard to the criteria for a checkpoint. (Doc.

---

[24]

Chief Mitch Osman was the Towanda Borough Chief of Police in May 2009. (Doc. 94-11, Ex. K, *Osman Deposition*, 9.)

[25]

Corporal David Andrascik gave deposition testimony as the State Police Representative on the creation and development of all policies and training curricula regarding the conducting of sobriety checkpoints and procedures and the FR6-3. (Doc. 94-10, Ex. J, *Andrascik Deposition*, 8.)

112, 15.) Mr. Ward contends the Commonwealth Defendants have not demonstrated that the location of the checkpoint was appropriate because they are relying on what he believes are stale statistics and a form letter request by Chief Seeley. (*Id.*) Mr. Ward also argues because there were few DUI arrests at the location over the years, the location selection was based on convenience rather than statistics. (*Id*.) However, Mr. Ward has not demonstrated that there are genuine issues of material fact in the evidentiary record. He has pointed to no differences in facts that could lead a reasonable jury to conclude that the checkpoint was an unconstitutional seizure.

Additionally, the PSP guidelines provide for the selection and location of a checkpoint. The guidelines list the following as factors for consideration:

1. Statistical date from PROphecy;

2. DUI-related crash lists provided by the Pennsylvania Department of Transportation;

3. Alcohol-related crash "spot maps" provided by PennDOT;

4. Data from any source which identifies a particular location, date, and/or time as having as high incidence of DUI-related activity, e.g., complaints, traffic/non-traffic citations, DUI arrests/contacts;

5. Maximum visibility from both directions and sufficient illumination including headlights, roof-mounted lights, flares, and/or artificial overhead lighting;

6. Low to medium traffic flow. If a non-divided highway is selected, consideration should be given to stopping traffic in both directions, thereby preventing high-speed traffic near the site;

7. The ability to stop traffic in the traffic lane for preliminary observation;

8. Sufficient adjoining space available off the traveled portion of the roadway (e.g., wide shoulders, rest or parking areas) for further questioning of the motorist when reasonable suspicion of a DUI or other violation has been developed.

(Doc. 94-10, 3.) In fact, Corporal Andrascik stated the guidelines were modified to comport with *Commonwealth v. Tarbert*. (Doc. 94-10, 16.) Mr. Ward has not come forward with evidence of record demonstrating any lack of compliance with the above guidelines.

Mr. Ward argues the singular determinant for the location of the checkpoint was based on the ability to pull people over rather than statistics. (Doc. 108, 9-10.) The Commonwealth Defendants have cited to several documents of record in which they provide support for the operation of the checkpoint at the location selected, including reference to statistical data. (Doc. 94-10, 125-33.) Mr. Ward has not successfully countered

these documents but instead contends that the "there was a lack of justification" in the statistics provided and the "facts make it totally clear that decision to have a DUI checkpoint at the Bingo Hall in Canton is not based on the required facts of having high probability of encountering intoxicated drivers or being an area where [sic] with a high number of DUI-related motor vehicle accidents." (Doc. 108, 10-11.) Mr. Ward may disagree with the reasons why Canton Borough, the DUI TaskForce and the PSP chose to hold the checkpoint at the time and place that they did, but based on the evidentiary record, the checkpoint was a reasonable seizure and therefore, does not violate the Fourth Amendment. Mr. Ward has not articulated any basis for liability on a claim for a Fourth Amendment unconstitutional seizure as against the Commonwealth Defendants.

### c. *Monell* Claim

Canton Borough has moved for summary judgment on Mr. Ward's *Monell* claim. Canton Borough argues that Mr. Ward cannot establish a claim for excessive force, however, Mr. Ward alleges that "Canton Borough had a custom or policy of holding DUI checkpoints in an area which did not meet the criteria set forth" in the applicable Pennsylvania case law. (Doc. 108, 7.) Mr. Ward alleges that Canton Borough is liable and that "[o]ur case meets all of the requirements for establishing municipal liability as initially set by the Supreme Court in **Monell v. Department of Social Services**." (Doc. 108, 11.) Mr. Ward asserts the "borough of Canton and chief Seeley were directly responsible for a 4th Amendment violation in the seizure of occupants of the Ward vehicle when they were stopped and detained at the DUI checkpoint." (Doc. 108, 13.) He further argues "[t]here is municipal liability for engaging in a custom or policy in that Chief Seeley set the policy and he was aware resulted in unreasonable seizures of persons in vehicles, since the statistics did not justify the checkpoint in that location." (*Id.*)

The Supreme Court determined in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 692 (1978), that a municipality or other local government may be subject to liability under § 1983. But local governments "are responsible only for their own illegal acts"; they cannot be held vicariously liable under § 1983 for their employees' actions. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Thus, to establish municipal liability

under § 1983, a plaintiff must prove that "action pursuant to official municipal policy" caused his injury. *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359.  The Third Circuit has stated that "proof of the mere existence of an unlawful policy or custom is not enough to maintain a § 1983 action." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). "A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered." *Id.* (citing *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984)). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d, 850 (citations omitted).

Mr. Ward alleges that Canton Borough "had a custom or policy of holding DUI checkpoints in an area which did not meet the criteria set forth in *Commonwealth v. Blouse and Commonwealth v. Tarbert*." (Doc. 108, 7.) However, Mr. Ward does not cite to any facts of record to demonstrate such. Even assuming *arguendo*, that the checkpoint was constitutionally infirm, there is no evidence of record that Canton Borough, through Chief Seeley, was aware that holding the checkpoint in the location selected was unlawful. Mr. Ward must do more than rest on the allegations of the complaint, he must produce factual evidence that advances his claims. He has not done so. Mr Ward instead cites the statistics relied on by Canton Borough and the Commonwealth Defendants as well as the fact that the officers who worked the checkpoint would be paid overtime, among other facts of record. (Doc. 108, 10.) However, Mr. Ward does not point to any differences in the factual record. Even when viewed in a light most favorable to him, there is no genuine issue of material fact. Simply stating the checkpoint was a sham is not sufficient. Additionally, as discussed above, based on the record, the checkpoint was not an unconstitutional seizure, therefore Canton Borough is entitled to summary judgment on the *Monell* claim.

Even if Mr. Ward had demonstrated that Canton Borough had an unlawful policy or custom,  "he must 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Berg*, 219 F. 3d.at 276 (3d Cir. 2000) (citing

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 392, 404, 117 S. Ct. 1382, 137 L.Ed.2d. 626 (1997)) (per curiam). If the "policy or custom does not facially violate federal law, causation can be established only by 'demonstat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" *Id.* Mr. Ward has not presented evidence that the decision to request a checkpoint and the selection of the location for the DUI checkpoint was made with deliberate indifference to known or obvious consequences by Canton Borough, nor that the checkpoint location selection was the moving force behind any alleged injury.

### d.    Qualified Immunity

Because Mr. Ward agrees that he cannot advance a claim against Chief Seeley for failing to intervene and because I have determined that Chief Seeley and Canton Borough are entitled to summary judgment on the failure to supervise and *Monell* claims, I will not address whether the Chief Seeley is entitled to qualified immunity.

### e.    Punitive Damages

As stated above, Mr. Ward concedes that punitive damages could not be sought from Canton Borough and therefore, summary judgment will be granted on the claim for relief.

Mr. Ward states that he is not seeking punitive damages against any of the Canton Defendants. (Doc. 108, 13.) Punitive damage are available "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. at 56, 103 S. Ct. at 1640.  Because Mr. Ward has not presented evidence of the conduct of Chief Seeley necessary for an award of punitive damages, summary judgment will be granted.

### III.      CONCLUSION

For the foregoing reasons, Defendants' motions will be granted in part and denied in part.

An appropriate order follows.

 November 24, 2015                                              /s/ A. Richard Caputo
Date                                                                  A. Richard Caputo
                                                                        United States District Judge